Bernard M. Mollner et al., appellees, v. City of Omaha et al., appellants, James W. Pattavina et al., interveners-appellees.

98 N. W. 2d 33

Filed July 24, 1959.  No. 34596.

*Herbert M. Fitle, Bernard E. Vinardi, Irving B. Epstein, Frederick A. Brown, Donald H. Erickson, Benjamin M. Wall,* and *Edward M. Stein,* for appellants.

*Theodore L. Richling,* for appellees.

*Webb, Kelley, Green & Byam,* for interveners-appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The city of Omaha, a metropolitan city, by a majority vote of the electorate of the city adopted a home rule charter on July 18, 1922, as authorized by Article XI of the Constitution of Nebraska. It, as originally adopted, consisted of the provisions of the legislation of 1921 to incorporate metropolitan cities and to provide for the government, powers, and duties of cities of that class. Laws 1921, c. 116, p. 397. The city of Omaha has from the effective date of that charter operated as a home rule city. The city of Omaha was, as to local affairs, governed by the 1922 charter until it was amended and thereafter as it was amended from time to time until a new home rule charter, adopted by the electorate of the city of Omaha on November 6, 1956, became effective. The former will be referred to as the 1922 charter, the latter as the 1956 charter, and the city of Omaha will be designated the city.

Section 8.20 of the 1956 charter has three parts. The first consists of the following: "(1) The respective provisions of the following sections of the Omaha Home Rule Charter of 1922, as amended, to the extent that such provisions are not inconsistent with the provisions of this charter, shall be in full force and effect in like manner as ordinances until superseded in whole or in part, respectively, by ordinances which the Council may and is hereby authorized to enact:  * * *." That is followed by a list of numbered sections of articles

identified by Roman numerals and following each section listed is a summary of the subject of it. The second states: "(2) The following sections of the Omaha Home Rule Charter of 1922, as amended, are hereby expressly repealed: * * *." That is followed by a list of numbered sections of articles identified by Roman numerals and following each section listed is a summary of the subject of it. The third declares: "(3) The following sections of the Omaha Home Rule Charter of 1922, as amended, all of which derive their force and effect both from the fact that they are laws of the State of Nebraska and provisions of the Omaha Home Rule Charter of 1922, as amended, shall not in the future have force and effect as charter provisions: * * *." That is followed by a list of numbered sections of articles identified by Roman numerals and following each section listed is a summary of the subject of it.

The plaintiffs in the district court will be herein called appellees. The interveners will be identified herein as they were in the trial court. The city and its officers will be herein designated appellants.

The validity of the entire 1956 charter was not an issue and was not considered or decided by the trial court. That was the finding and decision of that court and there is no cross-appeal. The validity or legal effect of subsection (1) of section 8.20 of the 1956 charter was and is an issue in this litigation. The trial court found: "THAT by Section 8.20 (1) of the Home Rule Charter of the City of Omaha, 1956, the electorate of Omaha retained certain specified Articles and Sections of the Omaha Home Rule Charter of 1922, as amended; that said Articles and Sections were retained as provisions of the Charter and not as Ordinances; that if an attempt was made in Sections 8.20 (1) of the Home Rule Charter of the City of Omaha, 1956, to repeal certain provisions of the existing Charter and at the same time to re-enact these provisions as Ordinances, such was and is not legal or valid; that the attempt to authorize

the City Council of Omaha to supersede by Ordinance any Charter provisions is illegal, ineffective and void; that, therefore, the provisions for compulsory retirement of city employees included in Ordinance No. 19728, which are inconsistent with the provisions of the Home Rule Charter of the City of Omaha, 1956, or with the Articles and Sections of the Omaha Home Rule Charter of 1922, as amended, which are retained, are invalid."

The conclusion of the trial court on this part of the case was that by section 8.20 (1) of the 1956 charter the electorate of the city retained the therein specified sections of the 1922 charter, as amended, as provisions of the existing charter and not as ordinances. The city council was permanently enjoined from attempting to supersede the sections or any of them in whole or in part, respectively, by ordinances, and appellants were enjoined from attempting to supersede or modify the provisions for compulsory retirement by other than procedures for proper amendment of the charter of the city by the electorate thereof.

The problem on this phase of the case concerns the authority of the electorate of Omaha to make designated and properly identified provisions of a prior home rule charter of the city a part of a new home rule charter of the city so that they would be applicable to and govern and control local affairs of the city as duly enacted ordinances containing the identical subject matter as the designated provisions could have done until the designated provisions were superseded by ordinances of the city which the council of the city was by the charter authorized to enact. A consideration of the stated problem invites a review of the purpose, nature, scope, permissible contents, and limitations of a home rule charter. The authority for home rule charters of cities is contained in sections 2 to 5, inclusive, of Article XI of the Constitution of the state. Section 2, adopted in 1912, includes the following: "Any city having a popu-

lation of more than five thousand (5000) inhabitants may frame a charter for its own government, consistent with and subject to the constitution and laws of this state, by causing a convention of fifteen freeholders, who shall have been for at least five years qualified electors thereof, to be elected by the qualified voters of said city * * *, whose duty it shall be * * * to prepare and propose a charter for such city, which charter, when completed, with a prefatory synopsis, shall be signed by the officers and members of the convention, or a majority thereof, and delivered to the clerk of said city, who shall publish the same in full * * *." Section 5, adopted in 1920, contains this: "The charter of any city having a population of more than one hundred thousand inhabitants may be adopted as the home rule charter of such city by a majority vote of qualified electors of such city voting upon the question, * * * subject to the Constitution and laws of the State."

State ex rel. Fischer v. City of Lincoln, 137 Neb. 97, 288 N. W. 499, contains the following: "The purpose of section 2, art. XI of the Constitution of Nebraska, providing that any city with more than 5,000 inhabitants 'may frame a charter for its own government, consistent with and subject to the Constitution and laws of this state,' was to render such cities as nearly independent as possible of state legislation. * * * Liberal judicial construction has encouraged this salutary assumption by municipalities of the powers and responsibilities of local self-government. * * * Recurrently we discover that democracy is only the hearth-shadow of local self-government and try to preserve the crackle of its flame. * * * The extent of the powers which may be incorporated in a home rule charter was defined in Consumers Coal Co. v. City of Lincoln, *supra* (109 Neb. 51, 189 N. W. 643), as follows: 'We hold that the city may by its charter under the Constitution provide for the exercise by the council of every power connected with the proper and efficient government of the munici-

pality, including those powers so connected, which might lawfully be delegated to it by the legislature, without waiting for such delegation. It may provide for the exercise of power on subjects, connected with municipal concerns, which are also proper for state legislation, but upon which the state has not spoken, until it speaks.' * * * The constitutional limitation that a home rule charter must be consistent with and subject to the laws of the state simply means, therefore, that on matters of such general concern to the people of the state as to involve a public need or policy, the charter must yield to state legislation. * * * But in matters which are purely of local concern, or which only indirectly or remotely affect the people of the state outside the particular municipality, the provisions of a home rule charter will control over conflicting statutory enactments. * * * And the legislature cannot, even by a general law, affect the powers of a city under its home rule charter over matters which are essentially municipal affairs. * * * In adopting a home rule charter, however, the city had the right to make provision therein for any form of local government it desired, which was not in conflict with the letter and spirit of our Constitution. Its right to adopt a particular form of government was in no way dependent upon whether the legislature, by statutory enactment, had authorized such a form, nor was it subject to the statutory conditions and limitations upon which the legislature had authorized a city to adopt it."

In Eppley Hotels Co. v. City of Lincoln, 133 Neb. 550, 276 N. W. 196, this court said: "A city may enact and put into its home rule charter any provisions for its government that it deems proper so long as they do not run contrary to the Constitution or to any general statute."

Noble v. City of Lincoln, 153 Neb. 79, 43 N. W. 2d 578, declares: "* * * in a city operating under a home rule charter the charter is the fundamental law

for the government of the city. It may contain * * * anything relating to its government which is not violative or in conflict with the United States Constitution or the Constitution or laws of this state. * * * The people of a city in the adoption * * * of a home rule charter act legislatively. * * * The significant difference between a city operating under a charter prescribed by the Legislature and one operating under a home rule charter is that while the two charters are legislative, in the former instance the legislative body is the state Legislature whereas in the latter it is the voters of the organized community itself. The power to act in each instance is constitutional but the action taken under the power is legislative."

Niklaus v. Miller, 159 Neb. 301, 66 N. W. 2d 824, speaking of a home rule charter, said: "As to all subjects of strictly local municipal concern such charter cities operate free and independent of state legislation."

Sandell v. City of Omaha, 115 Neb. 861, 215 N. W. 135, states: "The trend of judicial pronouncement appears to sanction an enlargement of the powers of the municipality for self-government, within constitutional limits, rather than a curtailment of such powers. And this on the broad and reasonable assumption that the city, in the formation of its charter, knows better than the legislature how to anticipate and to enact needful city ordinances."

A charter framed as the Constitution provides, within the limits prescribed, has the force and effect of one granted by legislative act. The words of the Constitution mean that the inhabitants may adopt a charter for the government of themselves as a city, including all that is necessary, desirable, or incidental to the government or affairs of the municipality. The power to form a charter may be likened to the power of a people to form a constitution. The charter of a home rule city is its constitution. The power of the electors to adopt a proposed charter carries with it the implied authority

to provide for the effective functioning of the new government under the proposed charter when adopted because the greater power necessarily includes the lesser and according to the theory of government provided by the constitutional provision for a home rule city the sovereign power is the people subject only to the constitution or any applicable general statute of the state. Consumers Coal Co. v. City of Lincoln, 109 Neb. 51, 189 N. W. 643; Noble v. City of Lincoln, *supra;* Streat v. Vermilya, 268 Mich. 1, 255 N. W. 604; Young v. City of Seattle, 30 Wash. 2d 357, 191 P. 273, 3 A. L. R 2d 704; 5 McQuillin, Municipal Corporations (3d Ed.), § 15.19, p. 93.

Massa v. City of Cincinnati, 51 Ohio O. 101, 110 N. E. 2d 726, was an action by a taxpayer to enjoin the city manager of Cincinnati and the director of the department of public works of the city from further continuance of a course of conduct being pursued by them in reference to the improvement of streets. The city had adopted a charter and an administrative code. The court said a question in the case was whether the method of procedure in repairing and resurfacing the streets violated any provision of the constitution or any controlling statute of the state. The opinion in the case contains the following: "Prior to 1912 municipal corporations in this state derived their powers from the General Assembly, and had only such powers as were thus granted. In 1912 the people of Ohio made a new and different distribution of power. Since that time municipalities deprive (derive)' their powers from the Constitution and not from the General Assembly. ARTICLE XVIII. 'Section 3. (Powers) Municipalities shall have authority to exercise all powers of local self government and to adopt and enforce within their limits such local police, sanitary and other similar regulations as are not in conflict with general laws.' * * * 'Section 7. (Home Rule) Any municipality may frame and adopt or amend a charter for its government and may,

subject to the provisions of Section 3 of this Article, exercise thereunder all powers of local self-government.' * * * Section 3 of Article XVIII has been before the Supreme Court in many cases. Some of those cases involved the question of whether certain matters were of purely local concern, or whether they were matters of state-wide concern. * * * In the case of Perryburg et al. v. Ridgeway, a taxpayer, et al., 108 Ohio St., 245, the Supreme Court squarely decided that matters with regard to streets were of purely local concern. * * * The Perryburg case would be decisive of the present controversy except for the fact that by the provisions of Article II, Section 1 of the city charter, Sections 4328, 4329 and 4331 of the General Code here in question have the force and effect of ordinances of the city. * * * Article II, Section 1 of the charter of the city of Cincinnati reads as follows: 'ARTICLE II. Legislative Power. Section 1. All legislative powers of the city shall be vested, subject to the terms of this charter and of the constitution of the state of Ohio, in the council. The laws of the state of Ohio not inconsistent with this charter, except those declared inoperative by ordinance of the council, shall have the force and effect of ordinances of the city of Cincinnati * * *.' This record fails to disclose that council has by ordinance declared any provision of the statute law here in question to be inoperative. * * * Having concluded that the repair and resurfacing of streets is a matter of purely local concern; that each municipality has the power under Article XVIII of the Constitution to proceed in any manner adopted by the municipal authorities, and having further concluded that by virtue of Article II, Section 1 of the charter adopted by the city, Sections 4328, 4329 and 4331 of the General Code, have in the instant case, the force and effect of ordinances of said city; and having further concluded that Section 13 of Article XVIII of the Constitution has not been violated, comes now the final determinative question in this case:

Has the city by its methods of resurfacing, violated the provisions of Sections 4328, 4329 and 4331 of the General Code?" The court then proceeded to a consideration and determination of that issue which is not important here. The important item is that the Ohio court held valid Article II, Section 1, of the charter of the city which adopted sections of the General Code and gave them the force and effect of ordinances of the city. The headnotes of the case are in part as follows: "By virtue of the provisions of Article XVIII, Section 3 of the Constitution, every municipality in Ohio has authority to exercise all powers of local self-government; and by virtue of Section 7 of that article every municipality has authority to frame and adopt a charter for its government. * * * The General Assembly of the state is without authority to limit the exercise, by a municipality, of all powers of local self-government. * * * Where the charter of a municipality provides that the laws of the state not inconsistent with such charter except those declared inoperative by ordinance of the council shall have the force and effect of city ordinances, such provision is binding on all municipal officers, and in the absence of an ordinance which declares inoperative state laws, the charter, the Administrative Code, state laws and municipal ordinances all must be given full force and effect in the exercise of any municipal function."

The practice of providing in the Constitution of the state that a certain provision thereof shall be in force until the Legislature provides otherwise has been indulged in in this state as proper and effective. State ex rel. Johnson v. Marsh, 149 Neb. 1, 29 N. W. 2d 799; State ex rel. State Railway Commission v. Ramsey, 151 Neb. 333, 37 N. W. 2d 502; State ex rel. Missouri P. Ry. Co. v. Clarke, 98 Neb. 566, 153 N. W. 623; In re Yellow Cab & Baggage Co., 126 Neb. 138, 253 N. W. 80. This is in principle what the electors of the city of Omaha did when they adopted the 1956 charter and therein provided that designated provisions of the 1922 charter

of the city should operate in the same manner as ordinances in the city of Omaha until they or any of them were superseded by ordinances which the council was authorized to enact.

The exercise of the legislative power or function of a municipality is not always exclusive in the city council thereof. The electors of the city may be and are often authorized to participate therein. In re Phahler, 150 Cal. 71, 88 P. 270, 11 L. R. A. N. S. 1092 (referred to as an authority in State ex rel. Fischer v. City of Lincoln, 137 Neb. 97, 288 N. W. 499), makes these comments: "Much stress is placed by petitioner upon the fact that in section 8 of article XI of the constitution the words 'legislative authority' are used in designating the ordinary legislative body of the city. The use of these words is taken as indicating the intent of the constitution that no legislative power could be exercised except by some representative body such as a council, etc., which should have supreme authority as to all matters of legislative nature. We see no force in this contention. * * * The words 'legislative authority' as here used have no greater significance than such words as 'common council or other legislative body' would have had. They were simply intended to designate the particular body which it was recognized would exist under some name or other in every municipality as the proper official agency to submit propositions for amendments to charters, and were not intended to define the powers of that body, or place it in a position where it would be beyond restrictions by the organic act of the city. * * * That the electors of a duly organized local subdivision of this state may be authorized to directly participate in the exercise of the legislative power of such subdivision cannot, we think, be seriously disputed. There is certainly no provision of our constitution which expressly or by reasonable inference prohibits it. There is no decision of this court which holds that it is forbidden." Likewise, it may be con-

fidently asserted that there is no provision of the Constitution of Nebraska or any decision of this court which prohibits the electors of a city from directly participating in the exercise of legislative power of the city. On the contrary, there are provisions of the Constitution of the state which authorize the exercise of such power directly by the electors of the city.

The comments of appellees concerning Massa v. City of Cincinnati, *supra*, are an attempt to distinguish the grant of power by the Ohio Constitution to cities of that state from the authority conferred upon certain cities by the Constitution of Nebraska. The Ohio Constitution, as recited in the Massa case, says that municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local regulations as are not in conflict with general laws; and that any municipality may frame and adopt a charter for its government and may, subject to the foregoing provisions, exercise all powers of local self-government. This is precisely what the provisions of Article XI of the Constitution of Nebraska do, as has been determined by this court, for municipalities of Nebraska which are within the classes of cities described in that article of the Constitution. This court has variously stated this effect of the constitutional provision as is exhibited by the following: "Liberal judicial construction has encouraged this salutary assumption by municipalities of the powers and responsibilities of local self-government." State ex rel. Fischer v. City of Lincoln, *supra*. "The trend of judicial pronouncement appears to sanction an enlargement of the powers of the municipality for self-government, within constitutional limits, rather than a curtailment of such powers." Sandell v. City of Omaha, *supra*. " 'The purpose of the constitutional provision * * * is to render cities independent of state legislation as to all subjects which are of strictly municipal concern * * *.' " Eppley Hotels Co. v. City of Lincoln, *supra*. "As to all subjects of

strictly local municipal concern such charter cities oper-
ate free and independent of state legislation." Niklaus
v. Miller, *supra*. It could hardly be made clearer or
more conclusive that cities included in the provisions
of Article XI of the Constitution of this state have au-
thority to exercise all powers of local self-government.
That is exactly the construction given them. The con-
stitutional grant of power to these cities is self-executing
in the sense that no legislative action is necessary in
order to make it available to the municipalities of the
classes to which it applies.

It is provided in section 2 of Article XI of the Consti-
tution that a prefatory synopsis as prepared by the
convention should be published with the proposed char-
ter in full in a newspaper of general circulation in the
city three times, once each week, before the election for
adoption or rejection of the charter was held. The 1956
charter by its terms changed the governing body of the
city, was complete in itself, and was described in the
synopsis as and it purported to be on its face a new
charter of the city. The section says that the charter
submitted at the election, if ratified by a majority vote
of the electors of the city, shall supersede any existing
charter and all amendments thereof.

In Streat v. Vermilya, *supra,* the Michigan court said:
"A city may not have two separate and distinct char-
ters at the same time. * * * The proposed new charter,
if adopted, will entirely supersede the former charter."

State ex rel. Rose v. Hindley, 67 Wash. 240, 121 P.
447, states: "This court has many times noticed and
followed the rule that a new law purporting to be the
whole law upon the subject-matter of which it relates re-
peals a former general law on that subject, even though
the new law contains no express repealing clause. * * * It
follows that, since the new charter was adopted as a
new and complete charter, and in no sense as an amend-
ment of the old one, it thereby became the entire
organic law of the city, and all the provisions of the

old charter were thereby effectually repealed, although we do not find in the new charter any express repealing language directed against the old charter." See, also, Grobbel v. City of Detroit, 181 Mich. 364, 149 N. W. 675; 6 McQuillin, Municipal Corporations (3d Ed.), § 21.25, p. 216.

The 1956 charter by its terms disposed of all provisions of the 1922 charter and did not attempt to retain any part of the 1922 charter as such. The conclusion of the trial court that by section 8.20 (1) of the 1956 charter the electors of the city retained therein specific sections of the 1922 charter, as amended, as provisions of the existing charter and not as ordinances and that the city council of the city should be and was enjoined from attempting to supersede the sections or any of them, respectively, by ordinances, was incorrect and is without legal foundation. It was legally competent for the qualified voters of the city to make designated and properly identified provisions of the prior 1922 home rule charter of the city a part of the new 1956 home rule charter of the city so that they would be applicable to and would govern and control local affairs of the city as duly enacted ordinances containing the identical subject matter as the designated provisions could have done until the designated provisions were superseded by ordinances of the city which the council of the city was by the charter of the city authorized to enact.

Appellees alleged as follows: The 1956 charter provides the city council will not lessen the benefits or rights of employees in the city service on May 26, 1957, from those which the employees would receive under the pension and retirement systems in effect on that date, and no retirement rights or allowances of city employees would be affected by the adoption of the charter. There was on that date no compulsory retirement age for members of the Omaha police department. A section of ordinance No. 19728 of the city says that

such employees must retire when they attain age 60 unless retained on a year-to-year basis for cause shown and subject to a physical examination and that employees shall in no case be retained in the classified service after attaining the age of 65. Under the pension and retirement system contained in the 1922 charter, as amended, the maximum pension benefits would be secured only upon completing approximately 28 years of service. No compulsory retirement age was required by that charter and the maximum pension benefits which a retired employee could have received were $1,800 a year. The lowest pay of any member of the police department is in excess of $3,600 per year under the 1922 charter. No member of the police department was required to retire at any given age and could work and receive full salary and benefits so long as he was physically able to perform the duties of his position. The compulsory age requirements of the purported ordinance deprive every member of the police department of rights which he had on May 27, 1957. Joseph Lukas, one of the appellees, because of his age and length of service, will be deprived of earned pension or retirement rights or allowances and will receive lesser benefits or rights if the purported ordinance is permitted to take effect. This will cause irreparable damage to him. William Barger, because of his age and length of service, may be deprived of pension and retirement rights and will be irreparably damaged if the purported ordinance is permitted to become effective. Section 69-12.9 (a) of the ordinance of July 8, 1958, No. 19728, hereafter identified as the ordinance, requires a civilian employee to retire upon attainment of age 65 unless his service is extended on a year-to-year basis and the extension is contingent upon it being for the best interests of the city and upon securing approval from the personnel board not later than 30 days prior to such retirement. The ordinance was passed on July 8, 1958, and by its terms became effective 15 days after its

passage. It is because thereof impossible to meet the requirements of the ordinance and all civilian employees 65 years of age and over on the effective date are deprived of rights upon such purported ordinance being effective, and such employees will sustain irreparable damage.

The interveners allege that each of them is an employee of the fire department and an employee of the city and that they represent themselves and all others similarly situated. The purported ordinance of the city, contrary to the provisions of the 1956 charter, contains section 69-12.9 (b) for the compulsory retirement of employees upon the attainment of age 60 and this provision provides lesser pension benefits or rights for members of the fire department of the city than those members would have been entitled to have on May 26, 1957, under the pension and retirement system in effect on that date, contrary to section 6.09 of the 1956 charter. The purported ordinance is contrary to law.

The trial court found and adjudged that the provisions for the compulsory retirement of employees of the city as contained in the ordinance were inconsistent with the 1956 charter or with the articles and sections of the 1922 charter, as amended, which were retained and the said provisions of the ordinance were invalid. The court found and adjudged also that the compulsory retirement provisions of the ordinance were invalid for the reason they lessened the benefits or rights of certain employees of the city in the service thereof on May 26, 1957, contrary to section 6.09 of the 1956 charter.

The relevant parts of section 6.09 of the 1956 charter are: "The Council shall have authority to establish a pension and retirement system or systems for any or all groups of officers and employes in the service of the city. * * * The minimum or optional age of retirement for policemen and firemen shall not be less than fifty-five years, and for officers and employes of the civilian service shall not be less than sixty years. Pro-

visions for vesting may be included. The legal right to a pension or benefit for the members and beneficiaries entitled thereto shall become effective when such pensions or benefits become payable, and the same shall not be impaired, abrogated, or diminished thereafter. * * * In the establishment of any new system or systems pursuant to this action, the Council shall not in any way provide lesser benefits or rights for employees in the city service on May 26, 1957 than those employes would receive under the pension and retirement systems in effect on that date."

The ordinance provides classified civilian employees may retire at age 60, having a minimum of 10 years of service, and must retire at 65 except that upon request of the department head the employee may be retained in the interests of the city beyond age 65 on a year-to-year basis, subject to physical examination, but in no case may such employee be retained after attaining age 70; and police and fire uniformed personnel may retire at age 55 and must retire at age 60 except they may be retained on a year-to-year basis beyond age 60 in the interests of the city, subject to physical examination, but must retire at age 65 after January 1, 1959.

A civilian employee 67 1/12 years of age, with 23 years of service, had secured permission to continue his employment after he was 65 years of age but he complains he could not comply with the ordinance because it names an effective date 15 days after its passage and that a request for the continuance of his employment by the city could not be made by the head of his department 30 days before the effective date of the ordinance. This contention has no substance. The ordinance provides the request for retention in the service of the city shall be made by the department head to the personnel board for approval "not later than thirty days prior to the contemplated date of retirement." It is not required to be made not later than 30 days prior to the effective date of the ordinance. This employee had

not received any notification of being retired; in fact, he had made application for and had been granted permission to continue in the employment of the city.

The compulsory retirement provisions of the 1922 charter were contained in Article XXI, section 11 thereof, and were as follows: "On and after January 1, 1950, any member who shall have attained the age of 65 years shall be retired, except elective officials and officials appointed by the City Council. Upon written request of the member and approval by the department head, the Board may continue a member in service after age 65, but in no case beyond age 70, except that any elective official may continue as a member of the system during his tenure of office. * * * Any member whose employment is terminated under the conditions of this section and who has less than 10 years of total service shall receive, in lieu of a service retirement allowance, a refund of his total contributions plus accumulated interest as provided in Section 15." There was nothing therein concerning the length of time any employee could be retained on duty by the city in the period after he attained 60 years of age and until he arrived at 70 years of age. The ordinance contains similar provisions, except as to the age factor, relative to the retirement of police and fire personnel. They may retire at age 55 and must retire at age 60 except they may, on the conditions designated, be retained on a year-to-year basis but in no case beyond age 65.

If the employment of any employee was terminated when he had less than 10 years of service, he was entitled only to a refund of his total contributions plus specified interest and by section 12 of the same article of the 1922 charter the retirement benefits were payable upon retirement of an employee if he had attained the minimum age of 60 and had completed at least 10 years of total service as stated in section 10 thereof. The retirement age as fixed in the ordinance does not in any way change these benefits or rights. The retire-

ment age may affect and control whether an employee continues his service for the years necessary to qualify for a retirement pension but there is no legal requirement which compels an employer to continue the services of an employee regardless of his age in order that he may qualify for a pension. Since the mandatory retirement ages stated in the ordinance are above the minimum specified in the charter, the determination of the mandatory retirement age is a legislative matter referred to the reasonable discretion of the city.

Boyle v. City of Philadelphia, 338 Pa. 129, 12 A. 2d 43, was litigation instituted by and on behalf of certain members of the fire and police bureaus of the city of Philadelphia to restrain the enforcement of those provisions of the city budget ordinance of December 15, 1939, affecting firemen and policemen of the age and position of the plaintiffs who were afterwards appellants in the reviewing court. The question presented for decision was whether the council of the city of Philadelphia by provisions made part of a budget ordinance might provide for the compulsory retirement at the age of 65 and for the classification as second class at the age of 60 all laddermen and horsemen of the fire bureau and all patrolmen of the police bureau. In the opinion it is said: "Appellants also urge that this system of compulsory retirement violates the Pension Act of May 20, 1915, * * *. Appellees on the other hand insist that policemen and firemen were protected by pension or retirement pay prior to the Act of 1915, and are by section 10 of that Act expressly exempted from its terms. However, it makes no difference, since by the establishment of a pension or retirement pay the legislature does not guarantee to public employees a tenure for the period of service specified as necessary to fulfill the pension requirements, nor does it intend thereby to interfere with the full right of a municipality to dismiss its employees for cause or for reasons of efficiency or economy. Underlying all pen-

sion legislation is the necessary principle that one who has been legally discharged prior to serving the prescribed term cannot share in the pension or retirement benefits."

Ellsworth v. City of Portland, 142 Me. 200, 49 A. 2d 169, involved a situation resulting from the discharge of two police captains of the city on May 1, 1946, and the placing of them on the pension pay roll. Each of them claimed that such action of the city was without his consent and was unlawful. They sought mandamus against the municipal officers to have the order discharging them expunged and to have them restored to their positions as permanent members of the police force with the rank of captain. They claimed the action of the city was in violation of a statute which was a part of the charter of the city enacted in 1923 which provided that except for cause " 'neither the city council nor the civil service commission shall have power or authority to reduce, terminate, or diminish in any away (way) the pay, term of office, or pension or retirement privileges of the members of the police department or of the fire department of the City of Portland as now enjoyed by them * * *.' " The court said: "Whatever may have been the rights of the petitioners under the statute as originally drafted, the legislature had the right to amend the powers of the city in this respect, and in our opinion the amendment passed in 1927 controls; for, except as otherwise provided by the constitution, there is no vested right in a public office. * * * This amendment in our opinion gave to the city the right at its option, either on its own initiative or at the request of the individual member of the force, to honorably discharge any such officer coming within these provisions and to place him on the pension roll * * *."

In Humbeutel v. City of New York, 125 N. Y. S. 2d 198, the court said: "The plaintiffs contend that the law is invalid in that it is unreasonable and arbitrary. This might be said of every pension law. The court has

taken judicial notice of the various retirement laws, federal state and city. The mere fact that the law is unreasonable and arbitrary will not permit intervention by the courts. It is only where the law is so arbitrary and so unreasonable that it offends public sensibility that the courts may interfere."

The 1922 charter, Article VII-A, section 2, provided that any member of the police or fire department of the city who had served 25 years or over, in the aggregate, as a member in any capacity, of the departments of the city and also of the age of 55 years or more, was entitled to retire from service and should be allowed a pension. The 1922 charter also stated that upon reasonable notice and hearing the council had power to require any person eligible for retirement pension to retire and accept the same. The effect of the provisions of the 1922 charter was that a pension right thereunder vested when the pension provided became payable. Civilian employees were entitled to refunds of contributions to the pension system upon severance of employment before eligibility for pension and to pension "upon retirement." As to policemen and firemen, 25 years of service were required as a qualification for a pension. That charter also stated in Article VII-A, section 13: "Such contribution shall not give rise to any vested rights on the part of such members by reason of said contribution, unless and until said member has completed all the requirements for a pension herein provided." The present charter is consistent with the former one and the general law on the subject. It says the right to pension for persons entitled thereto shall become effective when the pension becomes payable and it shall not thereafter be impaired, abrogated, or diminished. The ordinance does not change or modify any pension system; in fact, there is no proof that any appellee or any intervener has any vested right in or to a pension.

Lickert v. City of Omaha, 144 Neb. 75, 12 N. W. 2d

644, considered the validity of an ordinance which submitted amendments to the charter of a city which were adopted by an election and became part of the charter June 30, 1942. This made changes in the pension system as it applied to the police department. Therein this court declared: "The existence of legislation making pension and retirement provisions for members of a police department and the acceptance or retention of employment as a member of a police department does not establish a contract, between the member and the city, that such members will thereafter be granted the retirement and pension benefits provided in such legislation. * * * Until the particular event happens upon which the pension is to be paid there is no vested right in the police officer to such payments. * * * The legislative change amending the pension provisions, previous to the happening of one or more of the conditions mentioned in the act, impairs no absolute right of property in the police officer." See, also, Sullivan v. City of Omaha, 146 Neb. 297, 19 N. W. 2d 510; Vanous v. City of Omaha, 148 Neb. 685, 28 N. W. 2d 560.

The findings and adjudication of the trial court as to section 8.20 (1) of the 1956 charter and the provisions of the ordinance for compulsory retirement of city employees as stated above are incorrect.

There were many parts of the ordinance found by the trial court to be invalid for various reasons such as conflict of the ordinance with the 1956 charter, attempt of the ordinance to delegate to individuals or the personnel board legislative powers, and inconsistency of the ordinance with itself. A detailed discussion of all the matters involved in and affected by the findings could not be contained in the reasonable confines of an opinion. An examination and study of the record have resulted in conclusions concerning the findings in these respects as follows:

The trial court found that subsections (1) to (4), inclusive, and subsection (8) of section 6.05 of the 1956

charter relate to persons seeking employment by the city and the remainder of the section concerns the employed personnel of the city and that the first subsection mentioned above requires that all persons seeking employment by the city take a competitive examination. This is correct. A consideration of the ordinance as a whole convinces that noncompetitive examinations are only incident to reallocated positions. The examinations concerned an employee or employees who have filled the position or positions that are reallocated. This does not involve in any way the original employment or the re-employment of a former employee. It does involve promotion and additional or new duties. It is not a violation of any provision of the charter relating to those seeking original employment by the city. Such examinations are authorized by the charter which provides for the promotion of employees from lower to higher positions in the classified service through an examination program which will foster a municipal career service. Such provisions are in fact only a proper transitional means to carry out the plan and object of the system for the benefit of the employee who is thereby promoted. There is no objectionable conflict in this regard between the charter and the ordinance.

The court found that the ordinance states that promotional examinations shall be of like kind and character as those for original appointment to the service and that the ordinance contains provisions for noncompetitive examinations for certain appointments and promotions and hence it is inconsistent with the charter and is also inconsistent with itself. The ordinance provides that examinations are to test capacity and fitness; may include written, oral, physical, or performance tests; and may consider factors such as education, experience, aptitude, knowledge, character, physical fitness, or other qualifications and attributes relative to fitness. There would seem to be no objectionable features to promotional examinations being of the same kind and

character as those for original appointments. In addition they consider quality and length of service. Noncompetitive examinations for promotions have been considered and disposed of in the immediately preceding discussion of the subject and what is said in relation thereto need not be here repeated. A careful examination of the ordinance and the charter has failed to establish any inconsistency existing in the provisions referred to by the court. The court has not pointed out any specific inconsistency. The petition in the case has no specific allegation pertaining to this and the petition of intervention only generally states the provisions for noncompetitive examinations in the ordinance are contrary to the provisions of the 1956 charter. The sections of the ordinance pertaining to examinations are not inconsistent but are clear, definite, and complete. The finding of the court concerning this is contrary to the record.

A finding of the trial court is that the ordinance violates the charter by providing that promotional examinations shall take into consideration the quality and length of service, where records are available, to provide the basis for such rating but the charter says the ordinance shall provide the methods of awarding pay increases and promotions based on merit and seniority. There is no evidence that there are any such records available and any attempt to evaluate merit and seniority on that basis would be mere speculation and improper. The provision of the ordinance which uses the elements of "quality and length of service" is tantamount to the terms "merit and seniority" in the charter. The ordinance provides for compensation of employees, for the preparation and adoption of a pay plan, and specifically provides for salary advancements or pay increases based on merit and each year of service to the extent of permitting a 2-step salary increase where deserved and an automatic increase upon completion of a 6-month probationary period. It also provides for a

pay increase upon promotion. The pay plan presently before the personnel board contains pay ranges and information for increments. The charter requires the personnel rules and regulations to be submitted to the council within 8 months after the appointment of the first personnel director but the classification plan and pay plan are required to be submitted to the personnel board only within 1 year of the appointment of the first director. The compensation or pay plan is required to be forwarded, with no time limit specified, to the mayor who in turn, without time limit, submits it with comments to the council for adoption as an ordinance. This shows that the charter requires and contemplates the adoption of personnel rules and regulations prior to the adoption of a classification plan and prior to the adoption of a pay plan by the process above mentioned. The ordinance also requires that a proper and suitable compensation and pay plan be adopted and does this by a verbatim repetition of a section of the charter. The record shows that the pay plan is presently before the personnel board. The ordinance comprehensively establishes rules relating to the classification plan which is also before the personnel board for consideration and evaluation and involves about 187 classifications among approximately 1,600 employees. The finding of the court in this regard cannot be sustained.

The trial court found that the ordinance includes neither a method of holding or grading competitive examinations and that section 6.05 of the 1956 charter requires the personnel rules to contain such provisions. The record does not sustain this finding. The ordinance prescribes the method of holding examinations in minute detail. Likewise, the method of grading competitive examinations is fully specified, including procedure for review and correction of any error in grading upon claim of error by the applicant.

The provisions of the ordinance are adequate to satisfy the requirements of the charter in reference to the

compensation or pay plan, promotion to foster a career service, and for increases and promotions based upon merit and seniority. The finding to the contrary is not sustained by the record.

A finding of the court is that a part of the ordinance designated "Selection By Examination" is vague and indefinite and fails to comply with the charter. The finding is no more informative or specific than that statement and is without support in the record. The section of the ordinance clearly provides for all regular appointments to be based on merit and fitness to be determined by examinations, as far as practicable, relating to capacity and ability to efficiently discharge the duties. It permits limitation to regular employees in the service if it is determined that there are sufficient in number and qualifications to provide adequate competition.

The trial court found a violation of the charter because in its language the ordinance attempts to delegate to the personnel director power to establish methods of holding and grading certain examinations. This relates to authority of the personnel board to delegate to the personnel director when the character or conditions of employment make it impracticable to supply the needs of the service by appointments in accordance with other prescribed procedures to fill positions involving unskilled labor, domestic attendants, or custodial work by the employment of such other procedures as the personnel director determines to be appropriate to assure selection of such employees on the basis of merit and fitness, but the section requires an examination to be utilized by the director as a basis of selection of employees for the positions. There is no claim that any party to this case is or can be even remotely affected by this section. It does not merit the condemnation assigned to it by the trial court.

The trial court found the ordinance failed to provide for hours of work and overtime pay in the manner re-

quired by the charter. The charter requires the personnel rules to provide for hours of work and overtime pay. The ordinance, concerning hours of work, says that each department head shall submit to the personnel director a report stating the present hours of work for all subdivisions of the department and these hours of work shall remain in effect until this section of the rules has been amended. It also says, concerning overtime payment, that each department head shall submit to the personnel director a report stating the present practices of the department controlling compensation for overtime work. These practices shall remain in effect until this section of the rules has been amended. These provisions do not comply with the mandatory charter requirement that hours of work and overtime pay must be provided in the personnel rules. The finding of the court in this regard is correct.

An insufficiency in the ordinance was found by the court because, as stated in the finding, it does not set out the manner in which disciplinary actions may be taken and the kind of actions permitted for specific causes. Disciplinary actions are provided in detail in more than 20 specifications followed by provisions for reprimand, suspension, demotion, or dismissal for violation thereof. Written reprimand and procedure for demotion, suspension, or dismissal are provided and the maximum time of suspension is fixed. Investigations, hearings, and appeals are specified. The personnel board may increase, decrease, or modify any penalty imposed. The decisions and actions in this respect are subject to all remedies available to officer or employee in the courts. The ordinance is sufficient and does not conflict with the charter.

The trial court said the ordinance failed to state the procedure for assignments of responsibility for making investigations, bringing charges, and taking other necessary actions in connection with violation of section 6.11 of the charter. The charter provision prohibits

discrimination because of race, politics, or religion, retention of those advocating overthrow of the government by force or violence, political or fund-raising activities, or holding of office in any political party; and provides for forfeiture by an employee of his position if he seeks an elective office, specified employment with any other public body, or a gift or payment regarding any test or promotion, but reserves his right to express opinions and to cast votes. Any person who willfully or corruptly violates any of the provisions of it is subject to dismissal and such other punishment as may be provided by law. The charter requires the personnel board to make any investigation which it may consider desirable concerning personnel administration in the city service and to report to the mayor and council its findings, conclusions, and recommendations. There is a provision in the ordinance which says that in connection with the review of an appeal or for any other purpose necessary to determine the adherence to any provision of the charter regarding personnel administration of these rules, the personnel board and the personnel director or either of them may conduct such investigations as are necessary. The functions and duties of the personnel board specified in section 6.04 of the charter are repeated verbatim in the ordinance. The charter makes the personnel director, the administrative head of the personnel department, responsible for the proper conduct of all administrative affairs of the department and for the execution of a personnel program prescribed in the charter, in the ordinance, and rules consistent therewith. The finding of the court in this respect is not sustained by the record.

A finding of the trial court is that the ordinance violates the charter by reducing vacation benefits and granting less earned vacation leave. The ordinance grants vacation leave of 1 day each month for less than 5 years of employment, 1½ days per month after 5 years of employment, accumulation to a maximum of

24 days, and other specific provisions regarding leaves. The charter provides that it shall not affect or impair employee vacation or sick leave accrued or the validity of eligible lists created under the charter provisions, ordinance, and rules in force at the time the charter took effect. The present charter does not provide any requirement that thereafter vacation leaves must continue at either a stated minimum or a greater rate. This is an administrative matter. If the basis of the finding of the court is that vacation leave accrued by employees prior to the effective date of the ordinance is adversely affected, then the conclusion is incorrect. The ordinance provides in case of employee's accumulation of vacation leave with pay exceeds 24 days on the effective date of the ordinance, such excess accumulation shall be taken at least at the rate of one-fourth of such excess accumulation per year in addition to current accruals of vacation leave with pay until liquidated. Any excess accumulations remaining 4 years from the effective date of these rules shall be forfeited. A requirement that accrued annual vacation leave be taken within a reasonable specified time is an administrative matter. Any accumulated vacation leave is preserved by the ordinance but it is not indefinitely or forever continued. The latter would be neither feasible nor sensible. This objection to the ordinance is unfounded.

The 1956 charter provides that a person occupying a position in the classified service of the city when the charter took effect, who had completed a period of probationary service, should be continued in that classification without examination or working tests until and unless lawfully reclassified or separated therefrom. The ordinance in section 69-4.3 states that an employee holding a position in the classified service who has not attained permanent status but who has served faithfully and adequately in his present position, as certified by the depatrment head, for a period of 6 months should

be given the status of a regular employee in his present position upon passing a noncompetitive examination. The trial court properly found that the above provisions are in conflict to the extent that the provisions of the ordinance requiring the employee to submit to an examination conflicts with the provision of the charter that his status shall continue without examination. To the extent of that conflict the ordinance is ineffective and an employee of the description contained in the charter and the ordinance is entitled to the status of a regular employee in his present position without an examination.

The trial court found that section 69-16.5 (e) is in conflict with the charter because it is an attempt to delegate legislative authority. The charter vests legislative powers in the council and states that personnel rules shall provide procedure and responsibility for taking necessary action in connection with violation of section 6.11 of the charter. The provision of the ordinance above referred to prohibits fund-raising activities by employees without prior approval of the personnel board. Prescribed standards under which the personnel board may approve such fund-raising activities require the personnel board to approve and publish a list of fund-raising activities which in its judgment comply with the standards set forth therein, and provide that such list shall not be restrictive but shall serve as a guide and authorize changes therein from time to time within the standards set forth in the subsection. The section of the charter above mentioned states that no nonelective officer or employee of the city service shall actively participate in any campaign, solicit or contribute funds for any political purpose, or hold office in any political party other than to exercise his right as a citizen to express his opinion and to cast his vote. The ordinance provides standards governing the board's approval. There is no basis therefore for saying that the ordinance attempts to grant

legislative power to the board. The finding of the court in this regard is without merit.

The trial court found that the statement of the ordinance that the city council should approve personnel rules and any amendment or revision of them conflicts with the charter provision that the council should enact a set of personnel rules and the charter provision that legislative powers are vested in the council. This is an instance of the use of loose and inaccurate language, but the charter provisions govern and the intention is clear that the approval spoken of in the ordinance must be in the form of an ordinance of the city. It is obvious that any amendment of an ordinance must be by another ordinance or by a superior law. The ordinance does not say how the council should approve any amendment or revision. The finding of the court cannot be sustained.

The charter states that the pay plan shall become effective when adopted as an ordinance by the council. Any amendment of it requires the same character of adoption by that body. The ordinance says the council shall approve the pay plan and any amendments thereto. The court found that these sections were in conflict and that the ordinance disregarded the fact that the charter vested all legislative power in the council. The court disregarded the ordinance as a whole and the parts thereof which should be considered together as relating to the same subject. The ordinance recites verbatim the provision of the charter that the pay plan shall become effective when adopted as an ordinance by the council and amendments to the plan shall require the same approval as the original adoption of the plan. The adoption of the plan and any amendment of it is required by the charter to be done by ordinance. The approval reference in the ordinance does not provide the method by which the adoption of the plan could be accomplished. The ordinance could not change the charter and the intention is clear that approval as used

in the charter was to be accomplished by a method of the character the charter makes mandatory, that is, by ordinance. The finding of the court in this respect is without support.

The judgment should be and it is reversed and the cause remanded to the district court for Douglas County with instructions to render and enter a judgment in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.